# Exhibit A

# Folkerts v. Seterus, Inc.

United States District Court for the Northern District of Illinois, Eastern Division

March 15, 2019, Decided; March 15, 2019, Filed

17 C 4171

**Reporter**
2019 U.S. Dist. LEXIS 42347 *; 2019 WL 1227790

DENNIS A. FOLKERTS and JANET L. FOLKERTS, Plaintiffs, v. SETERUS, INC., Defendant.

**Prior History:** Folkerts v. Seterus, Inc., 2017 U.S. Dist. LEXIS 146082 (N.D. Ill., Sept. 11, 2017)

**Counsel:** [*1] For Dennis A. Folkerts, Janet L. Folkerts, Plaintiffs: Thomas W. Toolis, LEAD ATTORNEY, Jahnke, Sullivan & Toolis, LLC, Frankfort, IL.

For Seterus, Inc., Defendant: Allan Zigmar Enriquez, Maurice Wutscher, Chicago, IL.

**Judges:** John Z. Lee, United States District Judge.

**Opinion by:** John Z. Lee

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiffs Dennis and Janet Folkerts sued Defendant Seterus, Inc., alleging that Defendant repeatedly contacted them via mail and phone regarding a debt that had already been discharged in bankruptcy. Plaintiffs claim that these communications violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. The parties have filed cross-motions for summary judgment. For the following reasons, Plaintiffs' motion and Defendant's motion are granted in part and denied in part.

### Background

The following facts are undisputed except where otherwise noted. Plaintiffs are Illinois residents. Defendant is a corporation engaged in servicing real estate loans. Pls.' LR 56.1(a) Stmt. ¶¶ 1-2, ECF No. 58-1; Def.'s LR 56.1(b) Stmt. ¶ 2, ECF No. 68.

In 2009, Plaintiffs obtained a residential property loan in the amount of $417,000, secured by [*2] a mortgage. Def.'s LR 56.1(b) Stmt. ¶ 5. On July 27, 2015, Plaintiffs filed for relief from their debts pursuant to Chapter 13 of the Bankruptcy Code. Pls.' LR 56.1(a) Stmt. ¶ 6. The Chapter 13 plan provided that the residence would be surrendered in full satisfaction of the debt, and the debt would be discharged. *Id.* ¶ 7.

In early February 2016, Defendant began servicing the loan. Def.'s LR 56.1(b) Stmt. ¶ 8. Then, on February 22, 2016, Plaintiffs received a discharge of their debts, including the mortgage loan, from the bankruptcy court. Pls.' LR 56.1(a) Stmt. ¶ 9. Defendant then filed a "Transfer of Claim Other Than For Security" in the bankruptcy case on February 29, 2016. *Id.* ¶ 10.

### I. The Parties' Communications

In early May 2016, Plaintiffs' bankruptcy attorney, John Reed, sent a letter to Defendant, inquiring whether it would accept a deed to the property in lieu of going through the foreclosure process. *Id.* ¶ 16. Reed asked Defendant to respond to his office, which Defendant did on June 20, 2016. *Id.* ¶¶ 16-

17; Pls.' Ex. 22, ECF No. 58-24.

Defendant claims that on July 27, 2016, it completed a "discharge review" of Plaintiffs' case and noted that Plaintiffs' bankruptcy included a surrender of the property subject to the [*3] mortgage loan.[1] Def.'s *LR 56.1(a)* Stmt. ¶ 10, ECF No. 67. According to Defendant, despite its understanding of this fact, it entered an incorrect code for the bankruptcy into its system. *Id.* The code it entered, "Code 5," signifies a "standard Chapter 13 bankruptcy where the long-term debt is not discharged (and resumes normal collections)." *Id.* But the loan should have been designated as "Code 17," which is for properties that have been surrendered and the debt discharged. *Id.* If the loan had been properly coded, Defendant claims, it would not have initiated contact with Plaintiffs unless they contacted Defendant and asked it to call them back. *Id.* ¶ 11. Additionally, Defendant explains, it would have sent an update to credit-reporting agencies, reporting the debt discharge with a zero balance and zero scheduled payment. *Id.*

Instead, on or about August 16, 2016, Defendant sent Plaintiffs a statement reflecting an amount due on the mortgage loan. Pls.' *LR 56.1(a)* Stmt. ¶ 30; *see* Pls.' Ex. 7, ECF No. 58-9. The statement claimed that a payment of $24,358.73 was due on September 1, 2016, and that if payment was received after September 16, a late fee of $113.53 would be charged. Pls.' [*4] Ex. 7 at 1. The statement further described the outstanding principal and interest rate and reflected a past-due payment of $20,434.68. *Id.* On the bottom of the first page was a detachable "payment coupon," which Plaintiffs could tear off and send back to Defendant with an enclosed payment. *See id.* The second page included a number of notices, such as information about how to avoid late-payment charges, request a payoff quote, seek relief for difficulty making payments, and sign up for autopay. *See id.* at 2.

On the bottom third of the second page, in smaller font, a disclaimer read:

> THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT. THIS NOTICE IS BEING FURNISHED FOR YOUR INFORMATION AND TO COMPLY WITH APPLICABLE LAWS AND REGULATIONS. IF YOU RECEIVE OR HAVE RECEIVED A DISCHARGE OF THIS DEBT THAT IS NOT REAFFIRMED IN A BANKRUPTCY PROCEEDING, YOU WILL NOT BE PERSONALLY RESPONSIBLE FOR THE DEBT.

*See id.* at 2; Def.'s *LR 56.1(b)* Stmt. ¶ 30.

Finally, on the [*5] third page was a "delinquency notice" showing that, as of August 16, Plaintiffs were delinquent on their mortgage loan by 259 days, and that "[f]ailure to bring [their] loan up-to-date may result in fees, foreclosure, and the loss of [their] home." Pls.' Ex. 7 at 3.

Statements in the same format, with different payment amounts and due dates, were sent on September 14, October 11, November 11, and December 14, 2016, and on January 12, 2017. Def.'s *LR 56.1(b)* Stmt. ¶¶ 31-35.

On September 23, 2016, Janet Folkerts sent Defendant an e-mail informing it that the August account statement was incorrect, and that the property subject to the loan had been surrendered in bankruptcy. Pls.' *LR 56.1(a)* Stmt. ¶ 18. She asked

---

[1] Plaintiffs argue that Foreclosure Litigation Corporate Officer Clay Brangham's affidavit, which forms the basis of Defendant's claims concerning a discharge review, is inadmissible. *See* Pls.' *LR 56.1(b)* Stmt. ¶¶ 10-11, ECF No. 71. The Court addresses the affidavit's admissibility for this purpose in the context of ruling on Defendant's *bona fide* error defense. *See infra* Section II.A.

Defendant to contact Plaintiffs' attorney, John Reed, for questions regarding the bankruptcy and discharge. Def.'s LR 56.1(b) Stmt. ¶ 18. Defendant then called Reed nine times. Pls.' LR 56.1(a) Stmt. ¶ 19. On October 4, Defendant spoke with Reed, who again asked for a deed in lieu of foreclosure. *Id.* On October 5, Defendant sent Reed a letter stating that it had received his inquiry and would send a written explanation of the results. Def.'s LR 56.1(a) Stmt. ¶ 18; *see* Brangham Aff., Ex. F.[2]

On October 12, 2016, Defendant [*6] called Janet Folkerts's cell phone. Def.'s LR 56.1(a) Stmt. ¶¶ 19, 21; Pls.' LR 56.1(a) Stmt. ¶ 20. Janet explained that she was "not sure" if she was still represented by an attorney and that she did not want to receive any further calls from Defendant. Def.'s LR 56.1(a) Stmt. ¶ 21. At that point, Defendant began calling Plaintiffs regularly. *See* Pls.' LR 56.1(a) Stmt. ¶¶ 21-28; Pls.' Ex. 3, ECF No. 58-5.

On October 19, 2016, Plaintiffs told Defendant that they were represented by counsel and to contact him directly. Def.'s LR 56.1(a) Stmt. ¶ 22. The same day, Defendant sent Plaintiffs a letter stating that it had been notified that they were represented by an attorney, but did not have the attorney's contact information. *Id.* ¶ 23; Brangham Aff., Ex. G. Defendant asked Plaintiffs to provide the contact information within 20 days of the receipt of the letter. Brangham Aff., Ex. G.

On November 1, Defendant sent Reed a letter stating that its October 5 letter (which confirmed receipt of Reed's inquiry regarding a deed in lieu of foreclosure) had been sent in error. Def.'s LR 56.1(a) Stmt. ¶ 24; Brangham Aff., Ex. H. Defendant did not receive a response to this letter "confirming that [Reed] continued to represent Plaintiffs after the bankruptcy." [*7] Def.'s LR 56.1(a) Stmt. ¶ 25.

Meanwhile, Defendant continued to call Plaintiffs and send them account statements. On November 25, 2016, Janet Folkerts again informed Defendant that the property had been discharged in bankruptcy and that she did not want to receive further calls. Pls.' LR 56.1(a) Stmt. ¶ 24. On December 6 and 12, Plaintiffs told Defendant that they were represented by an attorney and terminated the calls. Def.'s LR 56.1(a) Stmt. ¶ 28. On December 20, Plaintiffs gave Defendant Reed's name, but said they did not have his contact information. *Id.* ¶ 29. On January 3, 2017, Plaintiffs stated that they would have their attorney call Defendant. *Id.* ¶ 30. And on January 11, Janet again informed Defendant that she had filed for bankruptcy and wanted to be removed from Defendant's contact list. Def.'s LR 56.1(b) Stmt. ¶ 25.

The parties had additional communications through June of 2017. On March 14, 2017, Plaintiffs stated that the discharged debt was being reported to TransUnion, and that they would be contacting a lawyer to file a lawsuit. Def.'s LR 56.1(a) Stmt. ¶ 33. On March 20 and 27, Plaintiffs told Defendant they had hired a lawyer, but refused to provide his contact information. *Id.* ¶ 34. On March 20 and June 26, Defendant [*8] sent Plaintiffs additional letters asking them to confirm whether they were represented by counsel. *Id.* ¶¶ 35, 42. And Defendant continued calling Plaintiffs, placing approximately 150 calls to Janet Folkerts's cell phone between August 17, 2016, and June 26, 2017. Pls.' LR 56.1(a) Stmt. ¶ 27; *see* Pls.' Ex. 3. Defendant also called Dennis Folkerts's cell phone approximately eight times during this same period. Pls.' LR 56.1(a) Stmt. ¶ 23.[3]

---

[2] Brangham's affidavit, which Plaintiffs argue is inadmissible to the extent it is not based on personal knowledge, *see supra* n. 1, also provides the basis for many of the facts concerning the correspondence between the parties. But Plaintiffs admit these facts. *See* Pls.' LR 56.1(b) Resp. ¶¶ 1-3, 6, 9, 12, 15, 17-18, 21-26, 28-34, 36-41. Accordingly, these facts are deemed admitted for purposes of summary judgment. *See* Local Rule 56.1(b).

[3] Defendant disputes these facts, but the call logs show over 150 outbound calls (designated with an "O" as opposed to an "I" for inbound) to Janet Folkerts's cell phone between these dates, as well as nine outbound calls to Dennis Folkerts's cell phone. *See* Pls.' Ex. 3; Def.'s LR 56.1(a) Stmt. ¶ 19.

## II. Defendant's Phone System

Defendant uses several software systems in the course of its business. For some calls, Defendant employs an automatic telephone dialing system, the Avaya Proactive Contact System. Def.'s *LR 56.1(a)* Stmt. ¶ 44. Defendant also provides its representatives with manual desktop phones, also made by Avaya, for loans ineligible for automatic dialing. *Id.* ¶ 45. The undisputed evidence shows that Defendant used its manual phones, not the Avaya Proactive Contact System, to call Plaintiffs. *Id.* ¶ 48. The manual phones do not store any lists of phone numbers and cannot generate random or sequential numbers. *Id.* Instead, to make a call using a manual phone, a representative picks up the phone and manually dials each digit of the phone number. *Id.* ¶ 49.

Both the [*9] manual phones and the Avaya Proactive Contact System are linked to SynTelate, a software program on each representative's computer through which a representative can log into their manual phone. Pls.' *LR 56.1(b)* Stmt. ¶ 45. SynTelate, an "interface for inbound and outbound calls by customer service agents to access customer information, the loan databases and the telephone system," is used to "manage the note taking process" for customer-service agents. Pls.' *LR 56.1(a)* Stmt. ¶ 13; Def.'s *LR 56.1(a)* Stmt. ¶ 45.

According to Defendant, SynTelate alone cannot make outbound calls or "perform any predictive dialing." Def.'s *LR 56.1(a)* Stmt. ¶ 45. Defendant's Policy and Procedure Manual, however, describes SynTelate as "a predictive dialer system which interfaces with our servicing system. The SynTelate system dials all phone numbers on select loans in accordance with a predetermined set of instructions or filters." *Id.* ¶ 55; Pls.' *LR 56.1(a)* Stmt. ¶ 14; *see* Pls.' Ex. 17 at Seterus/Folkerts 1015, ECF No. 58-19. When asked about this discrepancy, Adam Taylor, the manager of Defendant's Contact Strategy Department, explained: "I would say that is an error. I do not know why they say that . . . .

They certainly should mean Avaya Auto Dialer [*10] or Proactive Contact would be a better way of saying that." Def.'s *LR 56.1(b)* Stmt. ¶ 14; Def.'s Ex. J, Taylor Dep., at 70:10-19, ECF No. 67-10. Taylor reiterated several times that SynTelate has no capacity to make outbound calls or dial numbers. *Id.* Instead, Taylor testified, SynTelate shows on the computer screen the number that Defendant wants a customer-service agent to dial. Def.'s *LR 56.1(a)* Stmt. ¶ 49; Taylor Dep. at 57:18-58:21. The agent will then manually make the call to the number shown on the screen. Def.'s *LR 56.1(a)* Stmt. ¶ 49; Taylor Dep. at 57:18-58:21.

Defendant has additional systems that are connected to SynTelate, the Avaya Proactive Contact System, and the manual phones. Whether or not a loan is eligible for automatic or manual dialing is a decision made by the "Content Analytics Management Process" ("CAMP"). Pls.' *LR 56.1(b)* Stmt. ¶ 48. And all calls, whether manual or auto-dialed, go through PBX, Defendant's "central phone system." *Id.* Finally, all information about calls, such as when they start, whether a customer was on hold and for how long, and so forth, is stored on an "SQL server database structured container that contains a huge resource pool of all Seterus information." *Id.*

Plaintiffs submit [*11] an expert report from electrical engineer Bradley Walton. Pls.' *LR 56.1(a)* Stmt. ¶ 15; Pls.' Ex. 21, Walton Report, ECF No. 58-23.[4] Walton holds a Bachelor of Electrical Engineering and has over twenty years of experience in the information-technology industry. Walton Report at 2. He opines that "the systems utilized" by Defendant, "SynTelate, and Avaya, meet[] the definition of Automated Telephone Dialing Systems ('ATDS') as defined by [the TCPA]." Pls.' *LR 56.1(a)* Stmt. ¶ 15; Walton Report at 11. In particular, as to SynTelate, Walton states

---

[4] Defendant disputes the admissibility of Walton's report. Def.'s *LR 56.1(b)* Stmt. ¶ 15. The Court addresses the admissibility of Walton's report in the context of ruling on Plaintiffs' TCPA claim, *see infra* Section I.D.

that "[t]he material published by Seterus and the manufacture[r] clearly show that it is a predictive dialer" and SynTelate "is clearly a[n] 'ATDS' because it has the capacity / potential to store telephone numbers and dial telephone numbers sequentially or randomly." Walton Report at 10. He does not offer any conclusions about Defendant's Avaya manual phones.

### III. Consumer Reporting Agency Disputes

In the spring of 2017, Plaintiffs submitted debt disputes to the consumer-reporting agencies Equifax and Experian, resulting in Defendant receiving "Automated Consumer Dispute Verification" ("ACDV") forms from these bureaus. Def.'s *LR 56.1(a)* Stmt. ¶¶ 36-41; Pls.' *LR 56.1(a)* Stmt. **[*12]** ¶¶ 37-38. Defendant's policy regarding reinvestigations of such disputes provides that "one or more of the following actions may be taken" as part of the investigation—comparison of the disputed information against corresponding information in Defendant's system, review of the loan records and loan notes, review of the file contents and related correspondence, review of the credit reporting, and verification of payment history. Pls.' *LR 56.1(a)* Stmt. ¶ 40.

On March 20, 2017, Defendant received an ACDV from Equifax, indicating that the Plaintiffs were disputing the inclusion of the loan account on their credit report as it was "included in bankruptcy." Def.'s *LR 56.1(a)* Stmt. ¶ 36; Pls.' Ex. 13, ECF No. 58-15. Defendant responded on April 13 by removing the scheduled payment but continuing to report a loan balance and past-due amount. Pls.' *LR 56.1(a)* Stmt. ¶ 37; Pls.' Ex. 13. On April 18, Defendant received an ACDV from Experian reflecting the same dispute. Pls.' *LR 56.1(a)* Stmt. ¶ 38; Pls.' Ex. 14, ECF No. 58-16. Defendant received a second ACDV from Experian on April 19, complaining of "inaccurate information" on Plaintiffs' credit report. Def.'s *LR 56.1(a)* Stmt. ¶ 34; Brangham Aff., Ex. K. Defendant responded to both ACDVs on May **[*13]** 4, continuing to report a loan balance and past-due amount, as well as the fact that the loan was delinquent 180 months. Pls.' *LR 56.1(a)* Stmt. ¶ 38; Pls.' Ex. 14; Brangham Aff., Ex. K.

On April 17, 2017, Plaintiffs were denied mortgage financing from American Portfolio Mortgage ("APM"). Pls.' *LR 56.1(a)* Stmt. ¶ 41; Def.'s *LR 56.1(a)* Stmt. ¶ 68. APM indicated that the denial was due to a foreclosure from less than three years ago. Def.'s *LR 56.1(a)* Stmt. ¶ 73. On April 24, 2018, APM stated that it could not extend credit "[b]ased on numerous late payments on [a] previous mortgage." *Id.* ¶ 68. APM had received a credit report for Plaintiffs that indicated derogatory information, including "consumer disputes — reinvestigation in progress," Plaintiffs' discharge in bankruptcy, and several delinquent accounts. *Id.* ¶ 67. Plaintiffs told APM that Equifax had "corrected" the dispute "on their end" and that the result from Experian was "hopefully coming soon" but was not due until May 10. *Id.* ¶ 70; Def.'s Ex. P, ECF No. 67-16.

### Legal Standard

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The Court gives **[*14]** "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP, 719 F.3d 785, 794 (7th Cir. 2013)*. In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The nonmoving party "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc., 674 F.3d 769, 772-73 (7th Cir. 2012)*.

## Analysis

Plaintiffs and Defendant both seek summary judgment as to Plaintiffs' TCPA, FDCPA, and FCRA claims.[5] For the reasons provided, both motions are granted in part and denied in part.

### I. TCPA Claim

The TCPA prohibits the making of any call to a cellular phone using an automated telephone dialing system ("ATDS"), unless the call is made solely to collect a debt owed to the United States, is made with the prior express consent of the called party, or is made for emergency purposes. *47 U.S.C. § 227(b)(1)(A)-(B)*. An ATDS is defined as "equipment which has the capacity . . . (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* *§ 227(a)(1)*. Plaintiffs contend that they are entitled to damages under the TCPA because Defendant called **[*15]** them using an ATDS without their consent. Defendant contends that it did not use such a system to call the Plaintiffs.

### A. Systems Used by Defendant

As an initial matter, the undisputed facts show that Defendant does own and employ an ATDS, the Avaya Proactive Contact System. Def.'s *LR 56.1(a)* Stmt. ¶ 44. It is also undisputed, however, that Defendant did not use the Avaya Proactive Contact System to call Plaintiffs. *Id.* ¶ 48. Instead, the record shows that Defendant's agents used manual phones to call Plaintiffs. *Id.*

Plaintiffs, however, point to the SynTelate system. They contend that the evidence shows that SynTelate is an ATDS, and that it is used for every call to every recipient. Thus, they argue, Defendant used an ATDS when calling their cell phones, thereby violating the TCPA. Defendant responds that there is no evidence from which a reasonable jury could find that SynTelate was used to call Plaintiffs' phones. This is incorrect.

Defendant's witness Adam Taylor testified that SynTelate "make[s] the queueing happen for manual outbound calls," and that representatives log into their manual phones through SynTelate. Taylor Dep. at 58:14-15, 60:5-8. Taylor further explained that SynTelate displays **[*16]** "[t]he phone number . . . that we want [a manually-dialing agent] to dial." Taylor Dep. at 58:20-21. Thus, a reasonable jury could conclude that SynTelate was used in making manual calls to Plaintiffs.

### B. Capacity to Dial Numbers

Defendant next asserts that SynTelate cannot qualify as an ADTS because the undisputed evidence shows that it "cannot make any outbound calls." *See* Def.'s Combined Mem. Supp. Mot. Summ. J & Resp. Pls.' Mot. Summ. J. at 5, ECF No. 66. Defendant points to Taylor's testimony as conclusive evidence that the statement in its Policy and Procedures Manual—that SynTelate is a "predictive dialer" and "dials all phone numbers on select loans"—is incorrect. *See* Pls.' Ex. 17 at Seterus/Folkerts 1015; Def.'s *LR 56.1(b)* Stmt. ¶ 14; Taylor Dep. at 70:14-19. But this testimony is merely evidence to be weighed alongside the manual, and a jury would be entitled to credit the manual over Taylor's testimony. In fact, Taylor's testimony was equivocal. As he explained it, "I would say [the manual's statement is] an error. I *do not know why they say that*." Taylor Dep. at 70:14-19 (emphasis added). Accordingly, a genuine dispute of fact exists as to SynTelate's dialing

---

[5] Plaintiffs originally stated claims for defamation and violation of the automatic stay and discharge injunction associated with bankruptcy. The Court dismissed Plaintiffs' claim relating to the automatic stay and discharge injunction for failure to state a claim. Order of 9/11/2017, ECF No. 22. Plaintiffs voluntarily dismissed their defamation claim. *See id.* Plaintiffs' amended complaint, however, reasserts these same claims. *See* Am. Compl. at 7, 10-11. Yet neither side makes any argument about these claims in their briefing. The Court assumes Plaintiffs have abandoned them, and accordingly, they are dismissed.

ability.

## C. Capacity to [*17] Store and Produce Numbers Randomly or Sequentially

Even if SynTelate or another of Defendant's systems can dial numbers, it is not an ATDS unless it can *also* "store and produce telephone numbers to be called, using a random or sequential number generator." *47 U.S.C. § 227(a)(1)*. Plaintiffs argue that the evidence showing SynTelate to be a "predictive dialer" automatically qualifies it as an ATDS under this definition. Plaintiffs also contend that Defendant's entire system has the "potential capacity" to function as an ATDS.

These arguments disregard recent binding case law from the D.C. Circuit in *ACA International v. Federal Communications Commission, 885 F.3d 687 (D.C. Cir. 2018)*, as well as decisions from courts in this district interpreting *ACA International*.[6] See *Johnson v. Yahoo!, Inc., 346 F. Supp. 3d 1159, 1161-62 (N.D. Ill. 2018)*; *Pinkus v. Sirius XM Radio, Inc., 319 F. Supp. 3d 927, 929 (N.D. Ill. 2018)*. These recent developments establish that (1) to be an ATSD, the equipment at issue must have the present, as opposed to merely the potential, capacity to function as an autodialer, *see ACA Int'l, 885 F.3d at 695-700*, and (2) equipment that merely has the ability to dial numbers from a stored list, as opposed to producing numbers using a random or sequential number generator, does not qualify as an ATDS, *see Johnson, 346 F. Supp. 3d at 1161-62*; *Pinkus, 319 F. Supp. 3d at 936-40*. Furthermore, these cases reject any contrary decision of the FCC, whether from the "2015 Declaratory Ruling" that was the subject of the petitions [*18] for review in *ACA International*, or from earlier decisions reaching the same conclusions. *See Johnson, 346 F. Supp. 3d at 1161-62*; *Pinkus, 319 F. Supp. 3d at 934-36*.[7]

These developments have two consequences for Plaintiffs. First, a "predictive dialer"—equipment that has the capacity to store, produce, and dial numbers at random, in sequence, *or* from a stored list—does not automatically qualify as an ATDS. *See ACA Int'l, 885 F.3d at 694* (quoting *In re Rules and Regs. Implementing the Tel. Consumer Prot. Act of 1991 (2015 Declaratory Ruling), 30 F.C.C.R. 7961, 7972, 2015 FCC LEXIS 1586 ¶ 10 & n.39*); *see also Pinkus, 319 F. Supp. 3d at 937-39*. Additionally, the "potential capacity" of Defendant's systems is irrelevant; in other words, using a system that could function as an autodialer only if some other software was added to it does not constitute use of an ATDS. *See ACA Int'l, 885 F.3d at 695-700*. Accordingly, Plaintiffs must point to evidence that the system Defendant used to call them had the present capacity to store, produce, and dial numbers at random or in sequence, not just the potential capacity to do so or the ability to dial from a list.

Plaintiffs have failed to point to any evidence that either SynTelate or the manual phone has that capacity. Certainly, once the Avaya Proactive Contact System is employed, Defendant is able to make autodialed [*19] calls. But that proves only that SynTelate and the manual phone have the "potential" capacity to function as an autodialer once other software is added. Liability on this basis is unavailable after *ACA International*. *See 885 F.3d at 695-700*. And even before that decision, courts in this district have declined to find that an

---

[6] The *ACA International* decision is binding on this court, since the D.C. Circuit "became the sole forum for addressing . . . the validity of the FCC's rule" once the petitions for review were assigned to that court by the Judicial Panel on Multidistrict Litigation. *Pinkus, 319 F. Supp. 3d at 932* (citing *28 U.S.C. § 2112(a)(3)*; *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc., 863 F.3d 460, 467 (6th Cir. 2017)*; *CE Design, Ltd. V. Prism Bus. Media, Inc., 606 F.3d 443, 450 (7th Cir. 2010)*; *Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1057 (9th Cir. 2008)*; *GTE S., Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999))* (internal quotation marks omitted).

[7] The Seventh Circuit's most recent decision on this issue, *Blow v. Bijora, Inc.*, explained that predictive dialers qualified as ATDS's. *855 F.3d 793, 800-01 (7th Cir. 2017)*. But *Blow* predated *ACA International*, and the Seventh Circuit has not yet had the opportunity to address the effect of that decision.

ATDS was used, where an autodialer was merely an available piece of equipment in the defendant's inventory but was not used to call the plaintiffs. *See Messina v. Green Tree Servicing, LLC, 210 F. Supp. 3d 992, 1002 (N.D. Ill. 2016)* (click-to-dial equipment that could be linked to autodialing equipment was not an ATDS); *Modica v. Green Tree Servicing, LLC, No. 14 C 3308, 2015 U.S. Dist. LEXIS 55751, 2015 WL 1943222, at *3 (N.D. Ill. Apr. 29, 2015)* (click-to-dial equipment was not an ATDS merely because a representative was also able to log into autodialing equipment through the same server); *Dobbin v. Wells Fargo Auto Fin., Inc., No. 10 C 268, 2011 U.S. Dist. LEXIS 63856, 2011 WL 2446566, at *4 (N.D. Ill. June 14, 2011)* (no ATDS was used where calls were made using a manual phone, even though it was linked to the same universal server as the defendant's autodialing system).

Plaintiffs argue, however, that this Court should not be fooled by the false sense of "human intervention" provided by SynTelate and the manual phone. Pls.' Combined Reply & Resp. Def.'s Mot. Summ. J. at 6-9, ECF No. 70. They contend that the entire process Defendant uses for manually calling consumers—which involves representatives simply punching [*20] in the numbers that SynTelate tells them to dial—should still be considered an ATDS. The issue, however, is not whether human intervention was involved, but rather whether any system Defendant used to call Plaintiffs had the present capacity to store, produce, and dial numbers using a random or sequential generator. The Court need only apply the statutory definitions as they have been recently interpreted. And under those definitions, the systems Defendant used to call Plaintiffs—a manual desktop telephone and SynTelate—do not qualify as ATDS's on this record.

### D. Plaintiffs' Expert Report

Plaintiffs, nevertheless, argue that there *is* evidence that SynTelate functions as an ATDS under the TCPA—Bradley Walton's expert report. Walton not only contends that SynTelate is an ATDS, but specifically concludes that SynTelate "has the capacity / potential to store telephone numbers and dial telephone numbers sequentially or randomly." Walton Report at 10.

For its part, Defendant asserts that Walton's report should be excluded because his opinions are not based on a reliable or testable methodology. The Court notes that, although such objections are better addressed in a separate motion under *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, [*21] whether an expert is qualified under *Daubert* is an issue of admissibility, and "a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009)*.

*Federal Rule of Evidence 702* allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"—to help the trier of fact "understand the evidence or [ ] determine a fact in issue." *Fed. R. Evid. 702*. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* The proponent of an expert witness bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009)*.

District courts have broad discretion in determining the admissibility of expert testimony. *See Lapsley v. Xtek, Inc., 689 F.3d 802, 810 (7th Cir. 2012)*. In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony [*22] is reliable; and (3) the

expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See* Bielskis v. Louisville Ladder, Inc., 663 F.3d 887, 893-94 (7th Cir. 2011).

Defendant does not contest Walton's qualifications, only his methodology. In creating his report, Walton analyzed the discovery and depositions taken in this case as well as certain public websites about the Avaya Proactive Contact System and SynTelate. *See* Walton Report at 3, 8, 10. He provided his own definitions of the terms "predictive dialing" and "predictive dialer." *See id.* at 4-5. In describing his conclusions as to SynTelate, he relies on (1) the statement in Defendant's Policy and Procedures Manual regarding SynTelate's capacity as a "predictive dialer" that "dials all phone numbers on select loans," and (2) a statement from SynTelate's website. *See id.* at 10. The statement reads: "Syntelate provides access to a wide range of Avaya Proactive Contact capabilities and specifically supports the following functionality: Outbound Predictive; Call & Agent Blending; Outbound Managed; Fund raising; Agent Owned Recall; Inbound; Job Switching & Linking." *See id.* From there, Walton concludes:

> The material published by Seterus and the manufacture[r] clearly show that [*23] it is a predictive dialer. In my opinion the [SynTelate] System is clearly a[n] "ATDS" because it has the capacity / potential to store telephone numbers and dial telephone numbers sequentially or randomly.

*Id.* Walton provides no explanation of how he reached this conclusion other than his review of the SynTelate website and Defendant's manual.

The Court finds Walton's methodology unreliable and unlikely to assist the trier of fact. First, Walton appears to pull his conclusion regarding SynTelate's ability to store and dial sequential or random numbers out of thin air. This conclusion is not supported by the documents he cites. Nor is it supported by the statement that SynTelate is a "predictive dialer," since Walton's own definition of that term says nothing about sequential or random number generation. *See id.* at 4-5. Plaintiffs argue that Walton's experience is sufficient to allow him to reach his conclusions, but Walton did not actually examine the SynTelate system to determine its capabilities. Nothing about his methodology is testable, and there is no indication that he followed the scientific method. Walton merely looked at the same facts the Court is asked to consider and drew the *legal* [*24] conclusion that Defendant's systems are an ATDS.[8] "[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003). Accordingly, Walton's report is excluded.

Because there is no evidence that Plaintiffs were called using an ADTS—in other words, a system that has the capacity to store and produce numbers using a random or sequential number generator and to dial such numbers—Defendant is entitled to summary judgment on Plaintiffs' TCPA claim.[9]

## II. FDCPA Claims

Plaintiffs raise the following FDCPA claims: (1) Defendant failed to stop communicating with Plaintiffs after it became aware that they were represented by an attorney in connection with the debt, 15 U.S.C. § 1692c(a)(2); (2) Defendant improperly communicated with third parties about the debt, *id.* § 1692c(b); (3) Defendant failed to stop communicating with Plaintiffs when they asked it to do so, *id.* § 1692c(c); (3) Defendant engaged in harassment, *id.* § 1692d; and (4) Defendant falsely stated to Plaintiffs and credit bureaus that the debt was due when it was not, and

---

[8] Walton's conclusions regarding the Avaya Proactive Contact System are irrelevant as it is undisputed that Defendant did not use that system to call Plaintiffs.

[9] Because the Court concludes that there is no evidence an ATDS was used, the Court does not reach Plaintiffs' alternative arguments that Defendant called them without their prior express consent.

improperly attempted to collect on the discharged debt, id. § 1692e(2), e(8), (f). Defendant disputes each of these contentions and argues that any mistakes on its part are entitled to the [*25] *bona fide* error defense of § 1692k(c).

### A. *Bona Fide* Error Defense

Defendant claims that, to the extent it made mistakes in its communications with Plaintiffs, they were *bona fide* errors under 15 U.S.C. § 1692k(c). Under § 1692k(c), a debt collector is not liable for an FDCPA violation where the violation (1) was not intentional, (2) resulted from a *bona fide* error, and (3) occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such a violation. *Id.* § 1692k(c); *Ruth v. Triumph P'ships, 577 F.3d 790, 803 (7th Cir. 2009)*.

Here, Defendant claims that, after a "discharge review" in July 2016, Defendant realized that Plaintiffs' debt had been discharged and the property ordered to be surrendered. Def.'s Combined Mem. Supp. Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. at 18. However, due to an "error," the loan was "closed out of bankruptcy" with "'Code 5' which is for the standard Chapter 13 bankruptcy where the long-term debt is not discharged . . . , rather than 'Code 17' which is for a surrendered property (and discharge of debt)." *Id.* Had that coding error not occurred, Defendant contends, it would not have initiated calls with Plaintiffs unless they initiated the contact, and it would have updated credit-reporting agencies about the discharge. Furthermore, Defendant [*26] says, it does not send account statements when borrowers have received a discharge of the debt in bankruptcy.

In support, Defendant submits the affidavit of Clay Brangham, its Foreclosure Litigation Corporate Officer. Def.'s LR 56.1(a) Stmt. ¶¶ 10-12, 64; Def.'s Ex. A, Brangham Aff. The affidavit explains that Brangham has "knowledge of the facts stated herein based upon [his] review of Seterus's business records." Brangham Aff. ¶ 1. He states that his responsibilities include "reviewing and analyzing the business and loan records for loans that Seterus services," and that in the ordinary course of business, Defendant "maintains business records and a loan file for each loan that it services, containing among other things, a loan payment history, computer generated records, and copies of origination documents." *Id.* ¶ 3. He also attests that he has reviewed and is familiar with the business records for Plaintiffs' loan. *Id.* Additionally, he explains, such records are "comprised of entries made at or near the time of the event or occurrence by persons with knowledge of the event or occurrence and trained and authorized to make such entries." *Id.*

Plaintiffs object to Brangham's affidavit, contending [*27] that he lacks the personal knowledge needed to provide information regarding a discharge review or coding error. Moreover, Plaintiffs argue, Defendant failed to provide the records upon which Brangham based his statements. Accordingly, as Plaintiffs see it, there is no admissible evidence to support Defendant's claim of a coding error. *See* Pls.' LR 56.1(b) Stmt. ¶¶ 10-12; Pls.' Resp. & Reply Mot. Summ. J. at 24-27.

An affidavit may be used to authenticate and qualify documents under the business records exception to the hearsay rule, where the affiant has sufficient knowledge of the process by which records are kept and can attest that the records are reliable. *See* Fed. R. Evid. 803(6); *see, e.g., Thanongsinh v. Bd. of Educ., 462 F.3d 762, 777-78 (7th Cir. 2006)*; *States Credit Holdings v. Schilpp, No. 15 C 50090, 2016 U.S. Dist. LEXIS 95737, 2016 WL 3958890, at *2 (N.D. Ill. July 22, 2016)*. Brangham's affidavit does this, by providing the necessary foundation to admit certain of Defendant's business records related to Plaintiffs' loan. *See* Brangham Aff. ¶¶ 6-9, 14, 17, 21, 22, 32-35.

Strangely, however, Brangham does not provide the

necessary foundation for any records that substantiate Defendant's claim that it completed a "discharge review," after which a coding error occurred. In fact, the Court cannot locate *any* evidence in the record supporting those factual contentions, nor should it have the burden **[*28]** to do so. *See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)* ("Judges are not like pigs, hunting for truffles buried in briefs."). Defendant's Policy and Procedures Manual does contain sections on "Notification of Chapter 13 Filing," and "Discharge Review Guide." *See* Pls.' Ex. 17 at Seterus/Folkerts 994-995. But Defendant has pointed to no evidence, aside from Brangham's affidavit, purporting to show that such a "discharge review" was completed on July 27, 2016, or that the loan was improperly coded.

Yes, Brangham may have reviewed some records in preparing his affidavit, but the business-records exception found in *Rule 803(6)* is a mechanism by which a party may seek to admit the records themselves. It is not a mechanism for admitting testimony that is derived from the records, from individuals who otherwise lack personal knowledge. *See NRRM, LLC v. Mepco Fin. Corp., No. 10 C 4642, 2015 U.S. Dist. LEXIS 39058, 2015 WL 1501897, at *10 (N.D. Ill. Mar. 27, 2015)* (citing *United States v. Florez, 516 F. App'x 790, 794 (11th Cir. 2013)*; *United States v. Cameron, 699 F.3d 621, 648 (1st Cir. 2012)*; *Boclair v. Beardan-Monroe, No. 10-cv-978-SCW, 2012 U.S. Dist. LEXIS 124790, 2012 WL 3835874, at *4 (S.D. Ill. Sept. 4, 2012))*. In other words, "there is no hearsay exception for testimony about records not in evidence." *Florez, 516 F. App'x at 794*.

Brangham does not purport to have personal knowledge of the facts underlying the discharge review and coding error. *See* Brangham Aff. ¶¶ 10-12. Nor does Defendant provide any other evidence to support these assertions. As such, Defendant has pointed to no admissible **[*29]** evidence supporting its *bona fide* error theory. *See Gunville, 583 F.3d at 985* (explaining that summary judgment must be based on admissible evidence).

## B. Section 1692c(a)(2) Claim

A debt collector may not communicate with a consumer in connection with the debt if the debt collector "knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer." *15 U.S.C. § 1692c(a)(2)*. Liability under this section requires actual knowledge of the representation. *See Randolph v. IMBS, Inc., 368 F.3d 726, 729-30 (7th Cir. 2004)*. Plaintiffs contend that they informed Defendant, both directly and through their bankruptcy proceedings, that Reed was representing them in connection with the mortgage debt.

As an initial matter, Defendant argues that it did not have to assume that Reed's representation of Plaintiffs in bankruptcy necessarily meant that he represented them in connection with the collection of the mortgage debt. This may be true in principle, *see Polster v. Van Ru Credit Corp., No. 15 C 6676, 2017 U.S. Dist. LEXIS 48806, 2017 WL 1196888, at *8-9 (N.D. Ill. Mar. 31, 2017)*, but Defendant had more information than the debt collector in *Polster*. In *Polster*, neither the **[*30]** debtor nor the lawyer ever notified the debt collector that the lawyer's representation was continuing in connection with the subject debt. *See id.* By contrast, Reed contacted Defendant directly in May 2016, asking for information about a deed in lieu of foreclosure, and telling Defendant to respond to his office. In fact, for more than six months after Defendant began servicing the account, Defendant corresponded primarily with Reed; the only exception being an email Janet Folkerts sent questioning the debt and telling Defendant *to contact Reed. See* Pls.' *LR 56.1(a)* Stmt. ¶¶ 16-20. Before that time, it appeared clear on both sides that Plaintiffs were represented by counsel.

Still, Defendant insists, its contact with Reed during that time did not give it "actual knowledge" that Reed was representing Plaintiffs in connection with the debt. According to Defendant, *§ 1692c(a)(2)* "does not require Seterus to assume that John Reed represented Plaintiffs for their debt when the stated purpose of his correspondence was *limited to* requesting information regarding deed-in-lieu or cash for keys." Def.'s Combined Mem. Supp. Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. at 6 (emphasis added). But putting aside the fact **[*31]** that Defendant cites no authority for this proposition, this argument makes no sense in light of the status of Plaintiffs' debt. As Defendant acknowledges, Plaintiffs' debt had already been discharged in bankruptcy, meaning that all that was left to do was surrender the property to Defendant. Reed's correspondence with Defendant was aimed at achieving that result, so it is unclear what more he could have done to "represent" Plaintiffs "in connection with" the final disposition of their debt.

Accordingly, as of May 2016, Defendant knew that Plaintiffs were represented in connection with their debt. Despite this, Defendant sent Plaintiffs account statements in August, September, and October 2016. Furthermore, Defendant called Janet Folkerts on October 12, 2016. Each of these communications violated *§ 1692c(a)(2)*.

Defendant points to the fact that, when Janet Folkerts returned Defendant's call on October 12, she stated that she was "unsure" if she was still represented by an attorney. Def.'s *LR 56.1(a)* Stmt. ¶¶ 19, 21; Pls.' *LR 56.1(a)* Stmt. ¶ 20. Certainly, at that point, Defendant had cause to question whether Plaintiffs were represented, but that fact does not erase the earlier violations that occurred while, as far **[*32]** as Defendant knew, Plaintiffs *were* represented.

Because the undisputed facts show that Defendant contacted Plaintiffs despite actual knowledge of their representation by an attorney before October 12, 2016, Plaintiffs' motion for summary judgment as to their *§ 1692c(a)(2)* claim is granted.

Defendant's motion for summary judgment as to this claim is denied.

## C. *Section 1692c(b)* Claim

Plaintiffs, in their amended complaint, assert that Defendant's conduct violated *§ 1692c(b)*. In their motion for summary judgment and response to Defendant's motion, however, Plaintiffs make no argument concerning this section. Accordingly, Plaintiffs have abandoned this claim, and Defendant's motion for summary judgment as to this claim is granted.

## D. *Section 1692c(c)* Claim

As an initial matter, although Plaintiffs' motion seeks summary judgment on "each of the claims pled in their Complaint," Pls.' Mot. Summ. J. at 1, ECF No. 58, their supporting memorandum raises no argument regarding Defendant's liability under *15 U.S.C. § 1692c(c)*. Accordingly, the Court regards as waived any argument that Plaintiffs are entitled to summary judgment on this claim. See *Cooper v. Lane, 969 F.2d 368, 372 (7th Cir. 1992)* ("[L]egal arguments . . . not presented to the district court . . . were thereby waived."). That said, Defendant seeks summary **[*33]** judgment as to this claim, and Plaintiffs oppose Defendant's motion.

"If a consumer notifies a debt collector in writing that the consumer . . . wishes the debt collector to cease further communication with the consumer," the debt collector must do so. *15 U.S.C. § 1692c(c)*. Defendant contends that it is entitled to summary judgment because it did not receive a written request from Plaintiffs stating that they wished to cease further communications. Plaintiffs respond only that Janet Folkerts sent an email on September 23, 2016, informing Defendant that the mortgage debt had been discharged and surrendered in bankruptcy. But a notification that debt has been discharged is not equivalent to a notification that

one wishes all communications from the debt collector to cease.[10] Accordingly, the facts are undisputed, and Defendant is entitled to summary judgment as to Plaintiffs' claim under § 1692c(c).

### E. Section 1692d Claim

Again, Plaintiffs' memorandum in support of their motion raises no argument regarding Defendant's liability under 15 U.S.C. § 1692d. Accordingly, any argument that Plaintiffs are entitled to summary judgment on this claim is waived. See *Cooper, 969 F.2d at 372*. Defendant, however, seeks summary judgment on this claim.

The FDCPA prohibits a debt collector **[*34]** from engaging in conduct "the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5). Defendant contends that no reasonable jury could find that it intended to harass Plaintiffs by calling them because Plaintiffs contacted Defendant first, and because their attorney did not respond to Defendant confirming that he represented Plaintiffs. Additionally, Defendant contends that a reasonable jury could not find that it had the intent to harass because, but for a coding error, it would have stopped contacting Plaintiffs after their bankruptcy discharge.

Courts generally consider two types of evidence in circumstances like this. See *Hendricks v. CBE Grp., Inc., 891 F. Supp. 2d 892, 896 (N.D. Ill. 2012)*. Where plaintiffs have shown that they requested that the collection agency stop calling, or informed the collection agency that its information was incorrect, courts have found intent to harass. *Id.* The "volume and pattern of the calls" may also themselves evidence intent to harass. *Id.* "Whether or not the volume **[*35]** and pattern of calls is indicative of an intent to harass is often a question for the jury." *Id.*

Here, the undisputed evidence shows that Plaintiffs—primarily Janet Folkerts—received approximately 150 calls from Defendant between August 2016 and June 2017. See Pls.' Ex. 3. And these calls continued despite the facts that (1) Janet Folkerts had previously told Defendant that Plaintiffs were represented by an attorney, and (2) Janet told Defendant several times that Plaintiffs' debt had been discharged in bankruptcy. Furthermore, as previously explained, Defendant's *bona fide* error defense regarding the "coding error" lacks evidentiary support. And Defendant's assertion that Plaintiffs were the ones that first initiated contact does not help them, because it was Plaintiffs' *attorney* who initially contacted Defendant; Plaintiffs cannot be said to have themselves invited a barrage of calls to their personal phones.

Based upon the record, a reasonable jury could find that Defendant harbored intent to harass Plaintiffs. This is true even as to Dennis Folkerts, who received fewer calls than his wife, but who was still called after Defendant was informed of Plaintiffs' legal representation and **[*36]** bankruptcy discharge. Accordingly, Defendant's motion for summary judgment on the § 1692d claim is denied.

### F. Section 1692e(2) and 1692f Claims

The FDCPA broadly prohibits using any "false, deceptive, or misleading representation or means in the connection with the collection of any debt." 15 U.S.C. § 1692e. This includes falsely representing "the character, amount, or legal status of any debt." *Id.* § 1692e(2)(A). To be considered a "false" statement for purposes of § 1692e, a statement must be likely to mislead an "unsophisticated consumer."

---

[10] To the extent that Plaintiffs argue that a statement requesting that a debt collector contact the consumer's attorney going forward is a request for the debt collector to cease direct communications with the consumer, such a claim is more appropriately addressed in § 1692c(a)(2), not § 1692c(c).

*Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009). Relatedly, the FDCPA prohibits the use of any "unfair or unconscionable means to collect or attempt to collect any debt." *Id.* § 1692f.

Plaintiffs' claims under Sections 1692e(2) and 1692f center on the account statements Defendant sent them between August 2016 and January 2017. They contend that, because the debt was discharged in bankruptcy, the account statements listing the debt were false, misleading, and unconscionable. Defendant argues that there was nothing false or misleading about the statements because the debt *was* still owed, and the bankruptcy disclaimer on the account statements removed any doubt about the purpose of the statements.

Defendant's first contention is difficult to follow. It argues that Plaintiffs "merely allege" [*37] that the debt was discharged in bankruptcy, Def.'s Combined Mem. Supp. Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. at 24, yet concedes elsewhere that Plaintiffs' discharge is "undisputed," Def.'s LR 56.1(b) Stmt. ¶ 9. Although the surrender of the property may not have taken place at the time Defendant began sending the account statements, Plaintiffs' payment obligations had been discharged, and Defendant was prohibited from collecting money from them. *See* 11 U.S.C. § 524(a)(2). Accordingly, Defendant's contention that there was no false information in the account statements—which claimed that the loan *did* have a balance and payments due—is incorrect. *See Randolph*, 368 F.3d at 728 ("A demand for immediate payment . . . after the debt's discharge . . . is 'false' in the sense that it asserts that money is due, although, because of the . . . discharge injunction, it is not."); *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003) (same).[11] The fact that Defendant contends that it would not have sent the account statements or otherwise contacted Plaintiffs had it coded the account correctly acknowledges their inaccuracy and also supports this point.

Defendant next argues that the account statements were sent to comply with requirements under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. [*38], and that the "bankruptcy disclaimer" on the statements made this clear. It argues that the statements thus were not made "in connection with the collection of any debt," but instead were merely informational. But even if required by the TILA, the statements may create liability under the FDCPA if they were false, misleading, and made "in connection" with attempts to collect on a debt. *See Whalen v. Specialized Loan Serv., LLC*, 155 F. Supp. 3d 905, 912 (W.D. Wis. 2016) (explaining that whether or not statements are sent to comply with regulatory requirements, the question under § 1692e is whether the letters are "false, deceptive or misleading").[12]

Whether a communication is made "in connection with the collection of any debt" is a "question of objective fact, to be proven like any other fact." *Ruth*, 577 F.3d at 798. Courts consider (1) the presence or absence of a demand for payment, (2) the nature of the parties' relationship, and (3) the purpose and context of the communication. *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 384-86 (7th Cir. 2010). Here, the forms suggest an attempt to collect debt.

---

[11] Some cases acknowledge that, even if a debtor is no longer liable for a debt due to bankruptcy, a secured party has a right under 11 U.S.C. § 524(j) to seek "periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien."

*See, e.g., Helman v. Bank of Am.*, 685 F. App'x 723, 727-28 (11th Cir. 2017). Defendant has not framed its argument in this manner, but rather inconsistently contends that the debt was discharged but may still have been due anyway. In any event, Defendant also agrees that an *in rem* proceeding *was* undertaken in this case, and that a foreclosure of the subject property was completed as of February 2018. Def.'s LR 56.1(a) Stmt. ¶ 43.

[12] Defendant also briefly argues that it cannot be held liable for the account statements because they were in sent in "good faith compliance" with "the Consumer Financial Protection Bureau's guidance." Def.'s Reply at 11, ECF No. 75. Arguments such as this, raised for the first time in a reply brief, are waived. *See Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005).

Although the account statements do not "demand" payment *per se*, they look and feel like bills. They describe an amount due on the loan by an imminent future date, describe late fees that will be incurred if payment is not received by that date, and reflect **[*39]** charges for amounts past due. *See* Pls.' Exs. 7, 8, 9, 10, 11, 12. They contain a detachable form that one can use to send in a check. *See ids*. And they warn of future consequences for failing to cure the delinquency. *See ids*. In contrast, the "bankruptcy disclosure"—which appears in small type sandwiched between a wall of other text on the second page—inconsistently states that Defendant is "attempting to collect a debt," but not if the reader is in bankruptcy. *See ids*.

These details distinguish the forms in this case from the ones considered in cases cited by Defendant. For instance, in *Whalen*, the court considered two letters, and concluded that one of them—which merely stated the debt amount along with $0.00 in unpaid principal, interest, and fees—was *not* an attempt to collect debt. *See* 155 F. Supp. 3d at 907-08, 910-11. The second letter, by contrast, warned of consequences for default and suggested that the plaintiff get in touch regarding alternative payment plans in order to "keep [her] home." *Id. at 911*. The court found that the second letter *was* sent in connection with the collection of debt despite the existence of a bankruptcy notice. *See id. at 911-13*. And in another case cited by Defendant, *Cardona v. FCI Lender Services, Inc.* **[*40]** , the bankruptcy notice appeared "bold-faced" and on the first page. No. 17 C 1278, 2017 U.S. Dist. LEXIS 131908, 2017 WL 3531492, at *3 (N.D. Ill. Aug. 16, 2017). By contrast, in this case, the bankruptcy notice was included in letters seeking payment, which may lead an unsophisticated consumer to overlook it and view the statements as bills. Also relevant is the fact that Plaintiffs and Defendant had no past relationship before Defendant began sending the account statements. *See* Green v. Specialized Loan Servicing, LLC, No. 15-cv-513-jdp, 2016 U.S. Dist. LEXIS 95124, 2016 WL 3963255, at *3-4 (W.D. Wis. July 21, 2016).

A genuine dispute of fact exists regarding whether the account statements were attempts to collect debt. For the same reasons, there is a genuine question about whether an unsophisticated consumer would be misled into paying money to Defendant after viewing the notice, which contained false information about the status of Plaintiffs' debt.[13] *See* Wahl, 556 F.3d at 645-46. Furthermore, a reasonable jury could conclude from this record that Defendant used an unfair or unconscionable tactic—namely, collecting or attempting to collect an amount that is not expressly authorized by an agreement or permitted by law—in violation of § 1692f. *See* Green, 2016 U.S. Dist. LEXIS 95124, 2016 WL 3963255, at *5. Accordingly, Plaintiffs' motion for summary judgment and Defendant's motion for summary judgment as to Plaintiffs' § 1692e(2) and 1692f claims are both denied.

## G. Section 1692e(8) Claim

"Communicating or threatening to communicate **[*41]** to any person credit information which is known or which should be known to be false" is considered to be a "false, deceptive, or misleading representation in connection with the collection" of debt. 15 U.S.C. § 1692e(8). After Plaintiffs filed statements with Equifax and Experian explaining that their mortgage debt had been discharged, Defendant responded to the credit agencies by claiming that a balance was owed, and that payments were past due. Plaintiffs' claims under § 1692e(8) concern these responses.

The only argument Defendant makes in support of its motion for summary judgment on this claim is

---

[13] Defendant argues in passing that Plaintiffs could not have personally been misled by the account statements, because it was clear that they were aware the debts had been discharged in bankruptcy. But the "unsophisticated consumer" test is objective, so "it is unimportant whether the individual that actually received a violative letter was misled or deceived." Lox v. CDA, Ltd., 689 F.3d 818, 826 (7th Cir. 2012).

that "even if [it] reported any" false credit information to Equifax and Experian, "it was the result of the inadvertent coding error on the account." Def.'s Combined Mem. Supp. Mot. Summ. J. & Resp. Pls.' Mot. Summ. J. at 17. This echoes Defendant's *bona fide* error arguments, which the Court has rejected. Plaintiffs, however, contend that the statements to the credit agencies were false for the same reasons that the account statements were false—the debt was discharged in bankruptcy and any report indicating that it was still owed by Plaintiffs was false.

The Court agrees. Despite the ongoing existence of the mortgage **[*42]** lien, Plaintiffs' obligation to pay the debt—particularly with respect to any "past due" obligations—was discharged in the bankruptcy. *See Randolph, 368 F.3d at 728*; *Turner, 330 F.3d at 995*. Plaintiffs accordingly have made out a *prima facie* case as to the statements' falsity, and Defendant is not entitled to summary judgment. But, as with the account statements, a genuine dispute of fact remains regarding the statements' likelihood of misleading or deceiving an unsophisticated consumer. Plaintiffs' motion for summary judgment is thus denied as to this claim.

### III. FCRA Claim

Section 1681s-2(b) of the FCRA requires entities furnishing information to credit-reporting agencies to, upon receiving notice of disputed information, (1) "conduct an investigation regarding the disputed information," (2) "review all relevant information provided by the credit reporting agency," (3) "report the results of the investigation to the credit reporting agency," and (4) "report the results to other credit reporting agencies" if the original information was incomplete or inaccurate. *15 U.S.C. § 1681s-2(b)(1)(A)-(D)*.

Plaintiffs contend that Defendant violated *15 U.S.C. § 1681s-2(b)* by publishing an inaccurate trade line to Plaintiffs' credit report, failing to properly investigate Plaintiffs' disputes, failing to review relevant information, **[*43]** failing to correctly report the results of a reasonable investigation, and failing to report to credit-reporting agencies that the information on Plaintiffs' credit report was inaccurate. Defendant does not dispute that it failed to correct inaccurate information on Plaintiffs' credit report. Instead, it argues, even if it violated *§ 1681s-2(b)*, Plaintiffs' claim fails because they cannot establish either actual damages or willfulness for purposes of statutory or punitive damages.

### A. Willfulness

A consumer may recover statutory or punitive damages only for a willful violation of the FCRA; a negligent violation results in only actual damages. *See 15 U.S.C. § 1681n(a)* (providing for statutory and punitive damages for "willful noncompliance" with the FCRA); *id. § 1681o(a)(1)* (providing for actual damages for "negligent noncompliance" with the FCRA). To prove willfulness, a plaintiff must point to evidence that a defendant knowingly or recklessly violated the law. *See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 56-57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007)*.

Defendant contends that Plaintiffs cannot point to any evidence that it willfully violated its duty to investigate and correct Plaintiffs' credit dispute. For this proposition, it relies on the same facts forming the substance of its *bona fide* error defense to the FDCPA **[*44]** claims. "Seterus did not willfully disregard Plaintiffs' bankruptcy status," it argues, but rather "responded to the ACDVs as if the debt had not been discharged due to a coding error." Def.'s Combined Mem. Supp. Mot. Summ. J. & Resp. Pls. Mot. Summ. J. at 21-22. In response, Plaintiffs insist that Defendant did not maintain reasonable procedures to avoid the error and that if Defendant had merely looked at Plaintiffs' entire file, it would have seen evidence of the property's discharge in bankruptcy.

The willfulness standard imposes a higher *mens rea* requirement than the FDCPA's *bona fide* error defense. For *bona fide* error, Plaintiffs must simply prove that Defendant failed to maintain procedures reasonably adapted to capture the mistake, but for willfulness, they must set forth "evidence demonstrating conscious disregard or deliberate and purposeful actions." *Whiting v. Harley-Davidson Fin. Servs., 534 F. Supp. 2d 823, 831 (N.D. Ill. 2008)*; *see also Murray v. New Cingular Wireless Servs., Inc., 523 F.3d 719, 726-27 (7th Cir. 2008)* (explaining that recklessness under the FCRA requires substantially more than "ordinary carelessness").

Defendant's policy regarding reinvestigations provides that "one or more of the following actions may be taken" as part of the investigation—comparison of the disputed information against corresponding information [*45] in Defendant's system, review of the loan records and loan notes, review of the file contents and related correspondence, review of the credit reporting, and verification of payment history. Pls.' *LR 56.1(a)* Stmt. ¶ 40. It is undisputed that the file that Defendant maintained regarding the Plaintiffs contained notes from conversations with them and written correspondence stating that the mortgage loan had been discharged in bankruptcy. Other than Defendant's claim of a coding error (which the Court has already rejected), it does not explain what procedures were undertaken to review the status of Plaintiffs' loan and bankruptcy upon receiving the credit disputes. A reasonable jury could infer that, after looking at correspondence clearly indicating the discharged status of the debt, it would have taken "willful disregard" of that information for Defendant to fail to correct Plaintiffs' credit report. Accordingly, a genuine issue of fact remains as to this issue.

### B. Actual Damages

As for actual damages, Plaintiffs contend that they were denied credit due to the incorrect credit report; suffered loss of time, frustration, and "aggravation" associated with writing dispute letters and responding to [*46] Defendant's phone calls; and experienced emotional damage from the "helplessness of their situation." Pls.' Mem. Supp. Mot. Summ. J. at 14, ECF No. 58-2. Defendant argues that there is no causal connection between its actions and the denial of credit, and that Plaintiffs' allegations of emotional harm are too speculative.

As to the denial of credit, Plaintiffs were denied a mortgage loan after the lender, APM, received "derogatory" credit information on April 24, 2017, including information about Plaintiffs' credit-report disputes. Def.'s *LR 56.1(a)* Stmt. ¶ 67. At that point, Defendant had responded to the Equifax ACDV, but its response was not yet reflected in the information APM received. *See id.*; Def.'s Ex. N. And Defendant had not responded to the Experian ACDVs, as the deadline to do so had not yet passed. Def.'s *LR 56.1(a)* Stmt. ¶ 69. Based on these facts, it is not possible that APM's decision was based on Defendant's responses to Plaintiffs' credit disputes.[14]

Additionally, the Court agrees that Plaintiffs' evidence of emotional damages is too sparse to survive summary judgment. The only evidence regarding Plaintiffs' state of mind is offered by Defendant and consists solely of testimony by Plaintiffs [*47] themselves. For example, Janet Folkerts testified that she has taken blood-pressure medications for three to four years (although her dosage has decreased over time) and that Janet was "embarrassed" and "intimidated" by Defendant's calls. Dennis added that he believes Janet was

---

[14] Plaintiffs appear to contend that they still were harmed by the initial inaccurate reporting, which was reflected on their credit reports when they were denied credit. But a claim under *§ 1681s-2(b)* arises only after a furnisher has responded to a credit dispute. Although furnishers also have a duty to report information accurately to credit bureaus under *§ 1681s-2(a)*, the Seventh Circuit has explained that this section does not provide a private right of action. *See Walton v. EOS CCA, 885 F.3d 1024, 1029 (7th Cir. 2018)*; *Purcell v. Bank of Am., 659 F.3d 622, 623 (7th Cir. 2011)*.

"stressed out" by the calls. Def.'s *LR 56.1(a)* Stmt. ¶¶ 77-79. "When the injured party's own testimony is the only proof of emotional damages, he must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory statements." *Sarver v. Experian Info. Solutions, 390 F.3d 969, 971 (7th Cir. 2004)* (quoting *Denius v. Dunlap, 330 F.3d 919, 929 (7th Cir. 2003))*. With only the conclusory testimony from Plaintiffs that that they were "embarrassed," "intimidated," or "stressed," Plaintiffs have failed to meet their burden of creating a genuine issue of material fact as to this issue.

Accordingly, Defendant's motion for summary judgment is granted as to Plaintiffs' claim for damages from negligent noncompliance, but denied as to Plaintiffs' claim for damages from willful noncompliance. Plaintiffs' motion for summary judgment is denied as to both claims.

## Conclusion

For the reasons stated herein, Plaintiffs' motion for summary judgment and Defendant's motion for summary judgment are granted in part and denied in part. **[*48]** Plaintiffs' motion is granted as to their claim under *§ 1692c(a)(2)*, but is denied in all other respects. Defendant's motion is granted as to Plaintiffs' TCPA claim, claims under *§ 1692c(b)* and *§ 1692c(c)*, and claim for negligent noncompliance with the FCRA. In all other respects, Defendant's motion is denied. The case will proceed to trial on Plaintiffs' claims under *§ 1692d*, *§ 1692e(2)*, *§ 1692e(8)*, *§ 1692f*, and for willful noncompliance with the FCRA. A status hearing is set for 4/17/19 at 9:15.

**IT IS SO ORDERED**.

**ENTERED 3/15/19**

/s/ John Z. Lee

**John Z. Lee**

**United States District Judge**

**End of Document**